This cause was argued with all the zeal and ability, which the great importance of the property, and the difficulty of the questions which arose, required. And I am greatly obliged to the bar for the lights which have been furnished me in the case.
The first question made was whether the lands and negroes which had been conveyed by Mr. Cogdell to Mr. Alston, before Mr. Cogdell made his will, and taken back after he had made both will and codicil, will pass under the residuary clause to his three nephews^ J. S. Cogdell, Mr. C. and Mr. R. Cogdell l
If not, secondly, whether there was such a republication of the will after the taking back the lands and ne-groes as would pass either the real or personal estate so taken back.
3. Whether the legacy of 8001. to «Mrs. Cogdell and some other legacies directed to be paid out of the sales of the estate, were or were not addeemed, or lost by the failure of the fund, on the cancelling the bonds and mortgages of J. Alston to Mr. Cogdell t
4. Whether the widow can take the legacy and distributive share under the law of 1791, in the lands and negroes ? And also, her dower in the land ?
5. Whether if the legacies be not adeemed, they ought not to be paid out of the real estate, under the circumstances of the case ?
*363 On examining the will of Mr. Cogdell, it is obvious that his three nephews, the residuary legatees, were the peculiar objects of his care and affection, and that he meant to provide for them more extensively than any other persons. It is the duty of the Court, therefore, to give as full effect to the testator’s intentions as possible, consistent with the rules of law.
The strong probability is, that when Mr. Cogdell agreed to rescind the contract with Mr.. Alston for the lands and negroes, and to take them back, he was ignorant of the effect which that act would produce upon his affairs, and the application of his will to them.. It is almost certain that if he had been.. aware that the re-scisión of the contract, and taking a reconveyance of the property, would he considered as a new acquisition, which could not .pass under his will, he would have .republished his will, or in some way given his nephews the benefit of this property ; for they had' done nothing to forfeit the affection which had first prompted him to prefer them to other relations equally near to him.
This induces a strong inclination on the part of the Court to pass the lands and negroes under the residuary clause, if that be possible..
The old law befoi’e the act of 1791 was explicit that no real property acquired after making a will shall pass thereby, without republication; and the act of 1791 placed personal property on the same footing with real in that respect.
Now it is impossible to consider the . property in question in any other light than as newly acquired. Mr. Cogdell had parted with all his title to it. , It was firmly vested in Mr. J. Alston, and he could have conveyed it away to a third person, subject only to Mr. Cogdell’s lien on it by mortgage. He could have mortgaged it to another creditor, subordinate to Mr. C’s. mortgage. In making tax returns, Mr. Alston must have returned it as his property. Mr. Cogdell could not have returned it as his. It would have passed by Mr. A’s, will. On the other hand Mr. Cogdell had *364 . ceased to be owner. He could not have sold or mortgaged it. The will of Mr. Cogdell could not act upon only on the bonds given on the purchase. Then comes the rescisión of the contract and the reconvey-aneé of the property.
It was attempted to be shewn that Mr. Cogdell was of his old estate, and that this would have relation back to the original contract, which preceded the making the will, and then that the will would operate on it. If it were permitted to a Judge to have private feelings on a question of a legal, right; if it were possible for the Court to decide ex arbitrio, I should be glad to adopt this construction 1 as I do believe I should thereby give better effect to the testator’s original intentions. But I cannot consider it in that light. The law knows but two methods of the acquisition of property : by descent, or by purchase. This was a repurchase by which the estate was divested out of Mr. Alston and vested in Mr. Cogdell.
The form of reconveyance may be called quit claim, or by any other name, but in substance, it is a conveyance of a right then subsisting in Mr. Alston to Mr. Cogdell, in whom it did not then subsist. It is in legal language a purchase, a new acquisition. It would change the tenure exparte materna, and descend ex-parte paterna; consequently it would not pass under the residuary clause of a will made before such recon-veyance.
The weight of authorities is wholly with complainant upon this point. It is most clearly decided in the Duke of Leeds v. Munday, in 3 Vesey, jr. 348, that the legal estate in mortgaged premises, did not pass by a general residuary devise by the mortgagee. And this is the old law. See also 1 Atk, 605, Casborne v. Scarfe, & Co. Litt. 203, note 96, 1 Vernon, 3; 2 Vernon 401, 635. In the two great cases of Bridges v. the Duke of Chandos, 2 Vesey, jr. 417, 427, which was affirmed in the House of Lords, and in Cave v. Holford, 3 Vesey, jr, 650, this subject has been exhausted and settled.
*365 The rules both at law and ift equity áre, that after purchased or acquired lands do not pas's by a devise, That afterU will has been made devising lands, if they are conveyed by the testator to other persons, or if testator makeá a féofment to the use of himesif in fee or suffer a recovery, it is a revocation.
That even leases for yfears, or for life, and raort-gages in fee, and conveyances to pay debts, are > revocations pro'tanto, 3 Vesey, jr. 685, Templer v. Duke of Chandos. The words of Judge Rooke> Supported by the Court are very express. « If a man has parted «' With the legal fee, the law considers him according to “ my idea, as having another seizin. If therefore the «testator Conveys away the whole fee simple after « making the will, though he becomes seized again to « the'old use;' yet the conveyance renders the will ift- « effectual, not because he intended to revoke the will, « but because by the rules oflaw, the will cannot ope- « rate, 3 Ves jr. 651.” Now the case is much stronger Where testator first sells and conveys land in fete; then makes his will, and gives his residuary estate to palv ticulár devisees; then repurchases, or takes bade the estate in the lands. It is impossible as the law stands that this land shall pass by the will. If it could,' all the Old decisions are Wrong. ■ ‘
There was not such property in the lands and negroes, in the testator at the time of making his will, as would pass th'em. 1 Atk. 602, 4, Casborne v. Scarfe. When were the lands and the negroes vested in Mr. Cogdell ? On the reconveyance to him. This was subsequent to the devise, and they could not pass by it; the land could not pass by the old settled law; the negroes could not by the express provisions of the act of Feb. 1791.
The next question is whether there has been such a republication of the will in this case, as will give it effect ?
With respect to the real estate, there cannot he any doubt. The evidence of republication is altogether pa-rol, and this cannot prevail as to real estate. The law *366 is.too plain to admit of an argument. Parol evidence cannot even be received on the question, whether „th# tes-meant to revoke or republish a will of lands., 2 Ves. j. 606; 4 term rep. 604; 3 Ves. j. 650, 410, 11; 7 Bac. abr.
It must be in writing and executed in the presence, of witnesses, &c.
As to the personál estate,. that • is a .very, different question. Formerly there was no doubt, that a republication of atestamentofpersonal estatebould.be made by parol. And personal estate newly acquired would pass. But the decided cases áre not very numerous on this point, for, as by the English law, after acquired personal property would pass, under, the..general words of a testament, there was the less frequent' occasion ¡to advert to what would amqunt to a., republication.,; • Still cases occurred for the application of the, doctrine, and certainly a less formal mode of. repuMiqation was- ad-snittedasto personal, than as to., real estate,.’But. it was contended that the act , of 1791, which, declares, that no after acquired property, real or, personal should pass under a last will and testament,. without a. republication, had placed real and personal, propertycom-pletely on the same footing $ and that in.future, a republication of a testament of personal- chatties must be made in writing, with all the solemnities necessary . to give eifect to republications of wills of rea[ estate.. This however I do not conceive to have been the intention of the Legislature, or to have been . enacted by, it.. The point intended to be fixed by the act was, that no personal property acquired after making the will should pass without a republication, as in cases of real estate.
But the act does not profess to regulate the mode of republication. It leaves the law as it found it on that point. And I should no more think of altering the old method of republishing testaments of personal estate (under that statute) and conforming it to the mode of republishing wills as to real estates, than I should think of requiring testament of personal estates to be signed in the presence of three witnesses, as wills of real estate^ *367 are required to be. But certainly, in case of such alleged republication by pardl declaration, there can be no doubt that the court will, require clear proof of the animus republicandi. And slight circumstances will not induce the Court to be satisfied. A casual speaking of the will is not sufficient. There must be clearness as to the expressions, and certainly as to the intent. In one of the reported cases, the testator examining papers with a person who was assisting him, and who took up a paper by mistake, said, that is my will; and this was held not to be a republication • to pa,ss a lease which he had z’enewed, after making his will. See 2 Atk. 599. Abney and Miller.
In
This decision shews that in such cases, a direct reference to the will and speaking of it as his will, does not amount to a republication, unless there be animus republicandi. '
Undoubtedly there are cases where a written codicil amounting to a clear act of republication shall supei*-sede the necessity of an enquiry as to the animus repub-licandi. See 1 Vesey,jr. 486, 497, Barnes v. Crow; 3 Vesey, jr. 98, Pigot v. Waller.
These are very strong cases, and indeed they (following^ the case of Acherly v. Vernon, 1 P. Wms. 783,) have superceded the old cases, which examined into the intent of such codicils, whether as a república-feo n of the will or not.
Still, however, the question of intent must necessarily recur, when the alleged republication is of a testament' by parol.’
The question then is, is there such a clear act of parol republication, or such an expression of the animus re-publicandi, as will give new effect to the will and pas.< the negroes reconveyed by Mr. Alston to Mr. Cogdell. The answer, of Mrs.. Cogdell, the widow, and her explanations of Mr. Cogdell’s words on his death bed, expressly negative every idea of a republication. And the witness,.Mr. M’Dowall, says that Mr. Cogdell, on being questioned by his wife, if Üiere was any thing *368 116 wis^ied have done (Eluding to his Worldly affairs,) answered that all his papers ware arranged, and he gave Mr. M’Dowall the impression that he was easy and satisfied as to the situation in which he left lijs affairs..
There is nothing in this testimony which can give the of any latent design to republish his will, less of the actual expression of such design. A slight allusion to some unsettled business, seemed to hover over his mind and to cloud it, but it was so uncertain in the object, and so obscure as to any purpose or intent, that no conclusion can be drawn from it. One can scarcely makeup any opinion at all as to what he meant, and surely not an opinion, that he was acquainted with the effect of the reconveyance of the lands and negroes to him, and that he meant to republish his will and thereby dispose of them under the residuary clause of his will.
This expression of satisfaction in the arrangement oí his affairs previously made, indicates directly the con-rary. At all events it would be extremely hazardous to declare on such slight grounds that a testator has republished his will. It would lead to constant litigation and great uncertainty as to men’s wills, and would open a wide door for the entrance of incalculable mischiefs. It would be unsettling men’s wills so extensively and in- ’ juriously, and placing their affairs in the disposition of others, that it could not be borne.
With a thorough persuasion then thatif the testator had been aware of the effect, which the reconveyance of the property he had sold, would have had on his. will, he would have taken such measures as would have ensured the disposition of the property to his nephews, confor-mably to his intentions in the residuary clause of his will 5 and with every inclination to give full effect and operation to such supposed intention; I dare not go the length of establishing by a solemn decree a republication of a will on such slight and more than dubious grounds.
The result then is, that as this after acquired property, the lands and negroes, could1 not pass under the will. *369 and there has been no republication, which cajl ¡dispose of the property, it sinks into, the testator’s undisposed estate, and goes to the next,of kin*
The third question is, whether the legacy of 800?. to Mrs. Cogdell, and some other pecuniary legacies directed to be paid out oí the sales of the estate, were not a-deemed or lost by the failure of the fund on the cancel-ling the bonds and mortgages of Mr-. Alston to Mr. Cogdell Z
As the argument upon this question turns upon a supposed failure of the fund, out of which the legacies were to be paid, it is first necessary to examiné whether these legacies are general pecuniary legacies, to be paid out of a particular fund, or specific legacies ? The words of the will in the disposition of the legacy alluded to, have been accurately copied in the statement. That to the wife, is in these words : “ Also the sum of 800?. to be paid her in.r proportion as received, out of the sales of my estate.”
These expressions are repeated nearly in the Same words as to the legacy of 200?* to Mr* Egerton $ the Words are, to he paid him as above,
As to the legacy of 300?* to Hannah Shackleford, the words are, « 300?. out of my estate.”
As to the legacy of S00?. to_A* Barnup, the words are «to be paid him as above*”
As to the legacy of 20,0?. to Charles Egerton, the Words are, «to be paid as above.” And in the residuary clause to the three nephews, the words are, «to be paid them as above.”
Ho words of similarimgort are used in the bequest to his sister, Anna Cogdell, of 200?. Hor to the Yes-try of 50?, ,
It was insisted for the legatees that these were general pecuniary legacies, and that the reference made by the testator tp the.sale of his estate, meant to that sale, which he directed to be made by his executors. Consequently the. calling in the bonds, or consenting to can- *370 ce* ^iem> ^ad110 effect on these legacies, which must be' paid out of the estate generally.
On the other hand it was argued that the testator had distinctly marked the fund, out of which the greater part of these legacies were to he paid, which made them specific. In fact that all of them except alegacy of 2Ó Of. to Ihis sister, Mrs-. Anna Cogdell, and 501. to' the' Ve"stry, were directed to be paid in proportion as deceived out of the sales of his estate.
And that the s'afes thus állftded to by the testator Were the sales of the great part of his estate, which he had iriadeto Mr; Alston, a few months before he made liis will 5 arid that the contracts having been rescinded, the property récoriVeyéd* arid the bonds cancelled* the fund had failed arid these legacies could not be ráiséd.
To shew that the testator must have alluded to the sales which he himself had made, it wari stated and riot denied, that there was no residuary estáte* which could be sold under the direction of the will, but abóut six negroes, and that the testator’s debts' amounted to upwards of 509?. a sum riot far short of the Value of the six negroes; That the legacies unlocated on any particular fund amounted to 2501. and located on the sales to 18001. amounting to 20501. That to suppose the testator (Who necessarily took at such a time, a complete view of his affairs,) alluded to the insufficient fund of the sales of six negroes, at least three or four times short in value of the amount of the legacies to be paid, Was to suppose him very absurd 5 and that he had inade a gross mistake as to what property he had left fói* sale. But that such mistakes are not to be supposed, if any construction agreeable to’ reason can be found out. See 1 Atk. 415, Purse v. Snaplin.
It was argued further that the strong presumption was, that he alluded to the sales he had made himself, which being very large (80001.) furnished a most abundant fund to pay all the legacies, and to leave á large surplus to pass under his residuary devise.
Obliged* as the Court is frequently, to seek light from- *371 every permissible quarter, to ascertain the intentions of the testator, I am glad that there is no impediment to my resorting to the light furnished by these facts, relative to the situation of the testator’s affairs.
In the case of Lowndes vs. tlie exors. of Lempriere, ¡decided, in this Court, it was said by the Court, that it is permitted to a Judge to look at the circumstances of the testators estate, and of course to receive evidence on that subject, to form a judgment of his intentions, out of what fund a legacy was to be drawn. Reason and authority concur in this doctrine. Parol evidence was admitted to shew a trust from the mean circumstances of the pretended owner of the estate. Willis and Willis, 3, Atk. 71. And so it may be received in other cases, Hampshire v. Pierce, 2 Vesey, 216, 3 Yes. jr. 308, Silwood v. Mildmay. See particularly note a.
Upon looking at the circumstances and situation of the testator’s estate in this case, I should be strongly inclined to think that the testator meant, that the legacies were to be paid out of the proceeds of the sale, he himself had made, rather than out of the sale which he ordered to be made by his executors of the sm,all residue of the estate, if it were necessary to limit his intentions to the one sale or the other; because the one fund was, as he •well knew, perfectly adequate to the payment of the ie-gacies, and the other fund he must have known as well, was totally inadequate. But I doubt if the fixing upon either fund in the exclusion of the other, would be agreeable to the intentions of the testator, or at least trj the words of his will.
He gives his wife 800Z. to bp paid her in proportion as received out of the sale of his estate,” without say-7 ing out of what sale. In the several other legacies ho says “ to be paid as above.”
The legacy to Mrs. Shackleford « is to be out of his estate.” And the legacy to Mrs. Anna Cogdell, and to the Yestry are general, without saying how to he paid.
I do not, I confess, think that the testator can he said to haye referred to either sale separately; or that he *372 meant the legacies to depend «pon the one sale or the other 5 but that he looked to both, if necessary.
Nor does there seem to be any good reason to suppose that the testator meant any distinction or exclusive loca* tion in this case. Why should he ? For he disposes of residue, as well proceeding from the sale he had Made himself, as that which he directed his executors to make, to the same persons, his three nephews. And the provision he made for these pecuniary legatees, is in most of them the sole, and in all of them nearly, the chiéf provision made for persons near to him in blood.
And it is remarkable that he uses the same words “to be paid them as above,” in the residuary clause, disposing of all the rest and residue of his estate to his three nephews. Unquestionably he meant by this residuary clause to give them the proceeds of both sales — that already made and that directed to he made. Yet it is “ to he paid as above.” How ap above ? Why as he had directed the pecuniary legacies before mentioned to be paid, to wit, out of the proceeds of the sale of the estate. This would seem to cover all the legacies.
Upon the whole I am of opinion that the testator has not located these pecuniary legacies on dither sale $ hut they are payable generally outofthe proceeds of the sales of his estate, as far as they will go, and this will cover all his residuary estate. But the main question still arises: whether these legacies, being payable out of the sales of the estate, which the testator had made, and out of the residue of his estate directed to be sold by his executors j and the testator having cancelled the sale he made, and taken back the property, which does not, therefore, pass under the will, hut is distributable, does this a-tnount to such failure of that part of the fund which had been sold by the testator himself to Mr. Alston, as will defeat the pecuniary legacies, or be an ademption pro tanto ; or shall they he payable out of the distributable estate.
I have considered this question with great attention, find I haye examined all the authorities cited by the *373 counsel, as well as other cases which have occurred to me. It is certainly a difficult doctrine, and I do not think all the cases can he reconciled. The general leaning of the Court is against making specific legacies. There is a devise of certain sums to be paid out of the sales of the testator’s estate. ' Prima facie, this is a pecuniary legacy, with reference qnly to a fund for payment.
To be sure, however, a dear intent, distinctly expressed, or necessarily implied, may oblige us to consider it a specific legacy, or in other words a legacy given out of and depending solely on the existence of a particular fund. And if so, then the question would arise, whether the testator has adeemed that fund.
Is this then a pecuniary legacy, or a legacy made expressly to depend upon a particular fund, exclusively, and therefore specific ; and has such a change been Blade by the testator in that fund, by his consenting to take hack the lands and negroes, and cancelling the bonds, as destroys the legacy itself ?
For the residuary legatees it is contended that it is Such a specific legacy, and that the fund has been altered and the legacy adeemed.
These cases are relied on 4 Bro. C. C. 431, Badrick et al. v. Stevens et al. In this case the testatrix bequeathed certain sums to certain legatees, to be severally paid to them within three months after her death, out of 2001. due to her from John Cooper, on bond. Jolm Cooper paid the debt and took up the bond, in the lifetime of the testatrix. But whether voluntarily or on demand did not appear. This was held by the Court without much discussion, to he an ademption of the legacies. 2 Brown, C. C. 108, Ashburner v. Maguire.
The bequest was of the interest of a bond .due to the testator, to his sister for life, and the principal of the said bond on the decease of his sister to her four daughters. The debtor became bankrupt, and testator received a small dividend in his lifetime. There *374 were other dividends paid to the creditors after the testator’s death.
There was also in the case a bequest in these words, <t I bequeath to Mr. Wm. Beauses, my capital stock of 1000Z. in the India company’s stock.”
The testator had exactly 1000Í. stock at the time of his will and no more, but sold out the whole of it before his death. No difficulty arose as to this legacy of stock. The Lord Chancellor said no case countenanced that claim. The legacy was gone. The bequest was considered to be specific of the stock ; not pecuniary with reference to a fund. The difiiculty arose as to the other legacy. Upon that Lord Thurlow said there were two questions.
1. Whether the bond was given as a specific legacy; which depends upon this, whether the manner in which the sum is mentioned turns it to a pecuniary legacy, or as the civilians call it, a demonstrative legacy, that is, a legacy in its nature, a general legacy, but where a particular fund is pointed out to satisfy it, or whether it be what is called legatum nominis, or a legatum debiti.
2. Whether the legacy, supposing it to be specific, is adeemed, so far as the testator has received dividends in respect of the debt, (or as the bankrupt’s estate may be insufficient to pay the residue.) On the 1st point, the Lord Chancellor was clearly of opinion this was a specific legacy, for whenever a debt, or part of a debt is the subject bequeathed, it is legatum noininis, or legatum debiti. If in this case the fortune of the testator had failed, so as not to satisfy all the pecuniary legacies, this legacy would not have been bound to contribute.
When the testator made his will, 53001. was due him on the bond. He meant to relinquish th at bond for the benefit of those legatees, whether it turned out well or ill; the bequest must be considered though the sum be mentioned, for he said he could not agree to Lord Camden’s distinction in the Attorney General v. Parkin, -Ambler, 566, who held that the bequest of a debt, was pot adeemed by the payment of part of the debt to the *375 testator on the ground that the sum or amount was liamed in the bequest.
Ón the second point, whether the testator receiving a dividend, was an ademption of the whole legacy, the Lord Chancellor was clear that it was not; but only as far as the money was received. He Said one maxim had prevailed, recognised by Lord Talbot and Lord Hard-Wicke, which is that where a debt is bequeathed, and afterwards extinguished by the act, or with the concurrence of the testator, as by demand, or suit, the legacy was adeemed. But if paid in without suit or demand, there is no intention to adeem, and many cases go upon this distinction.
But Lord Camden in the case of the attorney-general V. Pai'kins, Aoibl. 566, held that there was no distinction between voluntary payment and payment on demand or suit, and that in both cases the legacy was extinguished, as far as paid in. And Lord Macclesfield in Thomond V. E. of Suffolk, 1 P. Wms. 461, disapproved of the distinction between a debt recovered by suit, or paid in voluntarily. And Lord Thurlow adopted the opinions of Lord Camden and Lord Macclesfield.
The Lord Chancellor after reviewing the cases, and shewing their palpable contradictions concluded that in the case before him, the testator intended that the lega-gatees should have the debt due on the bond, and decreed that the bond should be delivered up to the legatees, that they might receive the dividends not received by the testator, and whatsoever might thereafter be payable out of the bankrupt’s estate. In other words that it was a specific legacy $ adeemed as far as the money had been received; but no farther.
The next case relied upon by the residuary legatees, is that of Frier v. Morris, 9 Ves. jr. 360.
This was a bequest of all sum and sums of money, as testatrix’s executors may receive after her death, on the interest note of 4001. given to her by Messrs. Cross & Co. who were then bankrupts,
The testatrix received the money due on the note *376 some weeks before her death, and she payed it to a bank' ing house where she had no other money. She drew 1°£. and left the rest there at her death.
The, master of the rolls decreed that this was a specific legacy, and was adeemed by her receiving the mo* ney* That as to the argument that it was a pecuniary legacy, as it is a bequest of money to be received, it had no weight, for that is the case rtf every bequest of a debt. In the case of Avelyn v. Ward, 1 Ves. sen. 420, 5, Lord Hardwicke decreed that the legacy of stock was specific on the intent of the testator and the circumstances, shewing that he meant to confine the legacy to the stock he then had. Lord Hardwicke in this case said, that in deciding Purse and Snapling, he did it on the plain apparent intent of the testator. But he did not mean to decide that every legacy of stock must be considered not as specific, but general and consisting of quantity only. The intent shall govern, if it should ap-. pear that the testator meant to confine the legacy to the stock he had. And this agrees with Ashton, and Ash* ton decided by Lord Talbot. In the case before him# (Avelyn v. Ward,) as he considered the bequest to be? specific, he decided that the legatee should not abate with other legatees on deficiency of estate.
On the part of the widow and other legatees of certain sums to be paid out of the sale of the testator’s estate. It. was argued, that the sale spoken of by the testator, was the sale which he himself directed to be made of the residue of his estate $ or of that and the rest of liis estate ordered to be sold.
That this residue is uncertain. That the legacy of 8001. (and1 the other legacies of particular sums to be paid as above) was not a gift out of a particular debt which if lost, or not recovered, would fail, was not a specific legacy, but a legacy of quantity and number, referring to a fund primarily, but not exclusively.
That the Court neither inclines to construe legacies specific, unless plain and clearly so by will, nor to fa-■for ademptions unless intended to be so by Hie testator. *377 That the failure of a fund, to which.a legacy not specific is first referrahle for payment, does not defeat the legacy itself. And that the testator’s cancelling the bonds given by Mr. Alston, was not an ademption. The following cases were cited; Purse v. Snapling, 1 Atk. 414, 416. In this case the testator bequeathed to his niece 5000?. in the old So. Sea annuities* and to his nephew* 5000?. So. Sea annuities* At the time of making his will and at the time of his death* the testator had only 5000?. in the old So. Sea annuities stock. But the personal estate was more than sufficient to pay all his debts and legacies. Lord Hardwickfe decreed, contrary to the decree of the master of the roils* that these are to be considered as two distinct legacies, and the legatees are entitled to have them made good out of the testator’s assets, and the exor. was directed to purchase an additional 5000?. in the old So. Sea annuities for the legatees.
The Lord Chancellor examined all the objections. He said the testator had not designated this stock particularly.
He had not said “ my stock*’ to determine the property he held, but generally bequeathed 5000?. in the old So. Sea.atirtuities, and would operate as a direction, to the exors. to purchase stock to make up the legacies.
To the objection that this was a «specific legacy* and if not found in the testator’s funds would fail* he said there were two kinds of gifts* which passed under the name of specific legacies.
1. Where a specific chattel is described and distinguished from all other things of the same kind.
2. Something of the same species, which the exors. may satisfy by delivering something of the Same kind* as an horse, &c. The first kind may he called an individual legacy, and if not to be found, fails, and if disposed of by the testator, it fails.
But the second gift of 5000?. is not confined to thé 500QÍ. oldS* S. annuities, which the testator had* and *378 ^lcl>e^ore does not fall within the first rule, but these-corn], which is of a more liberal nature.
It is a legacy consisting of quantity and number, anti not confined to the strictness of the first rule. It is like the case of Partridge and Partridge, in cases Temp, of Lord Talbot, p. 226, where testator bequeathed 1000k S. Sea stock to his wife. He had at the time of making the will 1800k of that stock. He sold out 1600k and then bought in enough to make up the sum given. Then came an act of Parliament altering So. Sea stock ; then the testator died. It was decreed by Lord Talbot that neither the act of Parliament, nor the sale by the testator, was an ademption, for the devise of so much So.Sea stock, was descriptive of the nature and kind of the thing devised, not of the particular stock which testa-dor hail .; no more than if he had had no stock at the 'time of the devise.
The next case cite'd was that of Hinton and Pinke, 1 P. Wms. 540. The .point decided here was, that a le-gacy of 1500k to be Taid out in land, shall bo taken as land. But it is not specific, and must abate on a deficiency of assets. Lord Macclesfield said in this case ■that a legatee of a debt, which is lost by the insolvency of the debtor is specific, and-shall not'he entitled to contribution from other-legatees.
-In the "case of Thomond v. the Earl of Suffolk, 1 P. Wms. 461, where 'the testatrix bequeathed a debt of •4000k to a grand child, due by J. S. and provided that if any part of the debt should be paid in before the testatrix’s death, then so much should be made good to the .grandchild out of the surplus of the personal estate. 'The-testatrix released 2000k of the debt, without having received any of the money. It was decreed that this was not an ademption of the legacy pro tanto, but that the legatee was entitled to the whole 4000k as much as i'f paid in to the testatrix. This was evidently on the .ground of intention.
In the case of Ashton v. Ashton, cases Temp. Talbot, 125, a bequest of 6000k S. Sea annuities was decided to *379 fee specific, and not entitled to be made up out of the general estate, (less being left of that stock by testator.) But there the testator evidently meant the particular stock he had, for he orders it sold* The case of Sleech v. Thoringdon; 2 Ves. sen. 560, is of a legacy of 400Í. East India bonds. Only one bond was found at testatrix’s death, short of the sum of 400Z. -
This was decreed not to be a specific legacy, but of quantity and supplied out of the residue.
The case of the Attorney General v. Parkin; Ambler, 566.
The testator enumerates his mortgagee, bonds and notes, and then gives an annuity out of the interest, and devises the principal sums, and the overplus interest to a college.
This was held not to be a specific legacy, but of money, and that the legacy to the college was not a-deemed as to the money paid in, whether voluntary or not, upon the ground that the sum was named in the bequest; which ground Lord Camden admitted to be-slight, and Lord Thurlow afterwards said could have no weightand the decree of Lord Camden, was only supportable on other grounds in the case.
The case of Coleman and Coleman, 2 Ves. jr. 639, is as follows :
The testator by Ms will recited that he was possessed of a bill of exchange drawn in his favor, and accepted by the East-India Company, bearing an interest of 3 per cent. He bequeaths the interest to his wife for life,, and directed that after his death, the bill should b,e sold and the money divided among his nephews and nieces. He gave Ms wife all his household goods, plate, linen* china, notes and ready money in the house at his death. The testator afterwards received the money due from the East-India Company, and lent it out on private security, which remained due at his death, and was paid to his widow and executors. The nephews and nieces filed the bill to establish their right to the 15001, subject to the life estate of the wife. She by her answer insist *380 ed that the legacy wap adeemed» This fund formed the bulk of the estate. It was contended for the legatees that there could be no intention in the testator to a-¿eein * for this bill was paid in the usual course in which the Company pay their bills in rotation. This caPn°t be considered a specific legacy, with reference this security.
For the executrix it was insisted that this was a specific legacy and adeemed, That the distinction between yoluntary and compulsory payments has been exploded since the cases of Ashburner and Maguire, 2 B. C. C, 108 ; Attorney-General v. Parkin, Ambl., 566, The Lord Chancellor said it was true it had been said -that the distinction was exploded, and the application of it would frequently fail in particular cases. But the difference of a voluntary or compulsory payment would often furnish strong presumptions of intention on one side or the other.
He approved the decision of Lord Camden upon the whole case, He acted upon consideration of the whole will J the distinction will not decide in every case. The nature of tlie legacy and the particular will tóust be considered,
Upon the whole, (though the sum was not given, but the proceeds of ttye pales of the bill of exchange,) the Lord Chancellor decreed that this was not a specific legacy, adeemed by the receipt of the money by testator, but ike legacy should he raised out of the estate, subject to the wife’s life estate,
The next case is that of Roberts v. Pocock, 4 Yes. jr. 150, where it was decided that a legacy of 4000k divisible between the testator’s two nieces, and a legacy of 500Í. t» another girl, payable out of monies due to the ,|estator by A, Davidson,. should be considered general legacies upon the circumstances ; and upon the failure of the fund by the insolvency of Davidson, the legacies were directed to he raised out of the residuary estate of the testator,
In this case the testator seemed to have beeja away? *381 of the law, that if he called in the fund, it would he an ademption, and he provided against that by declaring that if he should receive the money or alter the security, it should not he deemed a revocation. He did neither; but the fund failed by insolvency. It was decided to he no ademption.
The Lord Chancellor said the arguments as to intention balanced each other. That he must take the will as he finds it. These legacies he did not think specific. The testator has not given the bond in form or substance. The legacies aré charged on the bond, and so far were specific that the Court would not have permitted the bond to have been applied to the prejudice of legatees, but for payment of debts. It would not have abated with other legacies. He therefore decreed that as the legacy was not specific, and the fund to which reference was made bad failed, it should be paid out of the estate generally.
The next case is Chaworth v. Beech, 4 Ves. jr. 555. In this case a legacy of the money due upon a note wa§ field to be specific. But this was upon the intention, notwithstanding the inclination of the Court is against specific legacies, and to hold it a general legacy with reference only to the security, as the fund first to be applied.
The master of the rolls said (565) that this was clearly a specific legacy as decreed in Ashburner v. Maguire, decided by Lord Thurlow.
That the bounds between specific and. pecuniary legacies are sometimes very nice and too refined $ yet we are now come to a clear understanding of the rule upon which the Court proceeds that the will is to be read with an inclination to hold it a general or pecuniary legacy, with reference only to the particular fund, as that out of which it is to be first paid. And the Court is so desirous to construe it a general legacy, that if there be the least opening to imagine that the testator meant to give a sum of money, and referred to a particular fund only as that out of which in the first place, he meant it *382 to be paid, the legacy will have this advantage, that it Sba^ be considered pecuniary, so as not to have the le-defeated by the instruction of the security, if that should be destroyed.
this could not apply to the case before the Court, w]lcre jt is impossible not to say that the testator meant give the note itself, with the interest due on it. Upon the will itself, and the authorities of Ashburner & Ma-guire (which is the true rule upon the subject,) he said he must decide this to be, the legacy is that note and nothing else. Lord Tinadow took two years to consider the case of Ashburner and Maguire.
He was afraid of overturning the case of the Attorney-General v. Parkins, decided by Lord Camden. What he decided establishes this, that if the legacy is meant by the testator to consist of the security, it is specific, though the testator begins with giving the sums due on it.
The case of Innis v. Johnson, 4 Ves. jr. 568, „yas similar to the above, and decided at the same time.
The case of Kirby v. Potter, 4 Ves. jr. 748, is where alegacy of 10001. “ out of myreduced bank annuities,” was held to he pecuniary, and meant 1000Í. sterling, payable out of bis reduced bank annuities, of which he had more than enough to raise the 1000Z.
The evidence being that the value of 10001. reduced bank annuities was no more than 4701. Decree that the sum of 1000Z. sterling be raised out of the sale of the reduced bank annuities*
Examing this question fully, some cases came under my view, which had not been cited by the bar ; one is Sibley v. Perry, 7 Ves. jr. 522, 536, where a direction to transfer 1000Í. stock in the public funds for the legatee, and that so much capital be kept in the public funds, is not sufficient to make the legacy specific.
The Lord Chancellor said (page 529,) there is no case deciding the legacy to be specific, without somc-thing marking the specific thing, the corpus, to be bequeathed.
*383 Another is the case of Webster v. Hale, 8 Ves. jun. 410. where a legacy of 8000Í. stock in the 5 per cent, Irish fund, was decreed to be pecuniary and not specific, whi- h last the Court leans against.
The last of the authorities I shall quote is that of Deane v. Test, 9 Ves. jr. 146, 151.
In this case it was decided that a legacy of 4000Í. stock in the 4 per cent, consolidated bank annuities (which is directed to be transferred directly to the legatees, is a specific legacy. But that a farther legacy to the same legatees of aoooi. more, to be paid out of the 4 per cent, consolidated bank annuities, was held to be pecuniary, as the prima facie construction, which is to be controlled only by plain inference from the rest of the will upon solid and rational grounds. It is pecuniary with a direction, out of what fund to be primarily paid ", but may come on the rest of the estate if that fails.
Thus have we made a long and laborious examination of the decided cases on this important and difficult question. It is full of perplexity and even contradiction. The neglect of testators to new model their wills to the new circumstances and changes of property which arise, produces infinite embarrassment. And there is a perpetual conflict in the minds of the Judges between their desire to give effect to the intention of the testator when it can be discerned, and the rules of law necessary to be observed as land marks of •property. The infinite diversity of the cases arising/ from the great variety of expressions used in wills, and! the great changes in circumstances, leaves much room \ for regret. It is the humiliation of the bench, perhaps of the human mind, to perceive Judges arrayed against Judges, opinions against opinions. Lord Macclcfield, Lord Camden and Lord Thnrlow, advocating one principle and decreeing solemnly under it •, and Lord Talbot, Lord Hardwicke and a later Chancellor holding an opposite opinion, or decreeing differently on shades of difference in the cases.
See Brown’s C. C. 110, Ashburner v. Maguire, where;. *384 this is displayed. It should, however, be added as thp justification or excuse of the Court, that there are such difficulties in the questions, and they are so varied by the words of wills and new modifications of property, that the keenest perception is sometimes bewildered in the vain attempt to seek and give effect to the of the testator, and at the same time to con-finan strictly to the rules of law.
Amidst these difficulties, however, we may perhaps discern with sufficient clearness to guide our steps, that it has been settled, that wherever a sum of money is intended to be given, to be paid out of or with reference to a particular fund, merely as the primary source of payment, this should be deemed a pecuniary and not a specific legacy ; and that the failure of the fund, or the calling it in, (whether voluntarily or involuntarily on the part of the testator, though that circumstance may sometimes furnish evidence of intent,) will not defeat the legacy. That the will is to be read with an inclination to hold it a general legacy, with reference to the particular fund, as that out of which it is to be first paid j but not confined to that fund, if it should fail,
On the other hand it seems equally clearly settled, that if a legacy is meant to consist of the security itself, it is specific; even though the testator begins by giving the sum due upon it. But to make it specific, there must be something marking the specific thing, the corpus, as the object of the gift. And that in such case, if the specific thing be destroyed, or the debt or slock specifically bequeathed be paid in, or called in voluntarily or involuntarily, it is an ademption wholly, or pro tanto as received.
Applying these conclusions to the case before the Court, it appears to me after the maturest and gravest consideration I can give the subject, that the legacies to Mrs. Cogdell, the widow and the other persons, to whom particular sums are given, are pecuniary legacies with reference to the sale of the testator’s estate, as the first fund for the payment. I cannot say that this reference *385 is such a bequest of the security itself, or corpus, as constitutes a specific legacy. Indeed upon great reflection, it does not appear to me that this case is so strong as many of the cases of legacies to be paid out of the stock, Which were decided notwithstanding to be pecuniary legacies, with reference to a particular fund in the first instance ; but to be paid generally out of the estate, if the first fund failed.
The legacies so given in the case before the Court, were far short in amount (not being above one fourth) of the value of the" estate of Mr. Cogdell, even if we suppose with the counsel for the defendants that the testator referred to the sale of the estate, which he himself had effected. How then can It be said that the legacy here was intended to consist of the security, the bonds proceeding from the sales of the estate ?
The corpus was not given to the legatees, but to remain with the executors, out of which to pay the lega-gacies, and the large balance was to go to the residuary legatees. These, therefore, in my judgment, were pecuniary legacies, and the calling in the bonds to which they had reference, (whether under the circumstances stated it should be held to have been done voluntarily or involuntarily) will not be permitted to defeat the legacies. They must be paid out of the assets of the estate generally.
I have come to this conclusion slowly and reluctantly, becausq I perceive that the testator’s intentions will not be fulfilled, and that those who were intended to have these legacies and no more, or but little more, will not only receive them, but will take a large share of those parts of the estate, which by the testator’s taking re-conveyances, do not pass under his will, to the prejudice of the residuary legatees, whilst those who were the chief objects of the testator’s providence and kindness, will be greatly defeated in their reasonable expectations, under the provisions of his will. But I am bound to pronounce what appears to me to be the law : I am only its voice, not its framer. - And the disappointment arts- *386 es ^rom ^16 ^stator’s own neglect, ih not altering his will to suit his new circumstances. As this however is a question of great difficulty, as well as importance, and as in the long investigation we have been obliged to pursue, the conclusions I have drawn from a great number of complicated and conflicting cases may be erroneous, I hope that my opinions and decree upon this point may be put under the revision of the Court of Appeals.
4. Another question was made, out of what fund the legacies should be paid. On decreeing- the payment of these legacies I feel that I shall be at liberty to direct that they,- as well as the debts, shall be paid out of the estate, to which the testator chiefly, if not wholly, had reference for their payment, and which not passing under the will, remains now an undisposed fund, applicable to these purposes, and the remainder subject to distribution under the act of 1791. This will leave that part of the residuary estate which did pass by the tés-tatelas will, to go undiminished to the residuary legatees, It will leave something for the will to work upon. And the testator’s general intent will not be so totally defeated, as it otherwise would be.
I am the more satisfied with this arrangement, (or marshalling the assets, if you please so to call it,) because it is founded on a very equitable principle. It is also an equivalent for the advantage which the legatees in such cases are allowed to have, if there should be a deficiency of assets, for though deemed pecuniary legacies, and only having reference to a particular fund for payment in the first instance, they are so far deemed like specific legacies, that in case of a deficiency of assets such legacies shall not be bound to contribute out of the particular fund, which is its peculium $ whilst on the other hand, if the particular fund fails, they may come upon the general assets for payment.
All the cases quoted lay down these doctrines. And ¡the case of Hamblin v. Leyster, in Ambl. 401, goes farther, and decides that when a legacy is given out of a *387 mortgage (but not specifically) and the money is after-wards received by the testator, and laid out in new securities, this is not only notan ademption of the legacy; but the legatee has a right to follow the fund for the satisfaction of the legacies. And as the money due upon two of the new securities was readiest for the legatees satisfaction, that money was directed to be called in forthwith for th at purpose. This case from Ambler is cited, approved and stated more largely and clearly by the Lord Chancellor in the case of Wood v. Penoyre, in 13 Ves. Rep. 335, 6, 7.
As therefore the legatee, who though pecuniary has by the will a reference to a particular fund for payment, shall have the advantage to be paid out of that fund without abatement, and may even follow the fund, if received and newly invested ; so in my opinion he ought to be confined to that fund, as long as it is sufficient to pay him, if that be necessary to the doing justice to the other legatees, even residuary legatee •, for though these last are not usually favored, the Court will do what it can for them, when it is manifest that the testator intended to provide chiefly for them, and by some unfor-seen events his intentions are much frustrated.
The legatees in the case before the Court should have interest on their legacies from the end of one year after the death of the testator, according to the case. 13 Ves. jr. 335, 7, and should be paid their principal sums when received out of the sales of that part of the estate which did not pass under the will, in consequence of the testator’s taking reconveyances of the property.
We come now to the consideration of the last question. Can the legatees take their legacies and also distributive shares under the statute j and can the widow' also claim her dower ?
I presume that the argument on this point was founded upon those cases, (though none were cited) which lay it down, that by the equity of this Court, no person shall take by the will of the testator j and at the same time do any thing which shall destroy the will. 2 Atk. *388 629, Morris and wife v. Burroughs and ethers. And that a person enjoying a benefit under a will, must abide by it in toto ; as well in taking a personal as a real es-^at;e ull(}er the will. 1 Ves. sen. 235, Cookes v. Hellier, whence it is argued that the legatees in the case before Court cannot claim the legacies bequeathed them, also take distributive shares in those parts of the estate, which do not pass under this will, by an alteration in the circumstances.
Upon examining these cases however the principle does not appear to go so far as the defendants would carry it.
They usually are where a testator has a right to dispose of some property and no right to dispose of some other property which is vested in others beyond his control ; And the testator makes dispositions by his will of both. There those who are entitled to property, which the testator had no right to dispose of, shall not take any. benefit under the will, unless they acquiesce in the dispositions made by the testator in relation to their property. This seems to be the general extent of the principle.
2 Ves. sen. 31, 33, East v. Cook, it is expressly said by the Court that there are exceptions to the rule of not claiming by one part of a will in contradiction to another, and that a legacy in lieu of things expressed is not to exclude from other benefit, though it may happen' to be contrary to the will.
It appears to me that this is the case in this cause.
The testator gave certain legacies, meaning them to be all the benefit those legatees should have in his estate. The residue of his estate he bequeaths to certain residuary legatees. By a change in his residuary property it cannot pass by his will, and therefore is distributable among his next of kin. Some ■•f these happen to be the pecuniary legatees first mentioned.
They do not claim distributive shares in contradiction to the will i but on a failure of the will to which they did not contiibute by any act of theirs. And l *389 think they are entitled to claim their legacies and take their distributive shares. With respect to the wife’s claim of dower, I presume there is no difficulty.
a testator has anumberofne-phews & meet es, & a wife. He bequeaths to his wife certain legacies Sc if she dies without leaving issue, all this he bequeathed to her, is to be divided among his heirs, hereafter named. He gave small pecuniary legacies to several of his nephews and nieces, and leaves the residue of his estate, (which was the bulk of it) to three favorite nephews. He says his exors. must seH the residue for the advantage of his heirs, and then bequeaths such residue to these three nephews. This selection of them as his heirs, will apply to the limitations over, on the death of his wife, without issue.
What is given her under the will is given in lieu and bar of dower. She gets all that and more too by the accidental failure of the residuary bequests of the testator, and she certainly has no claim to dower.
If there was any question of abatement for defect of assets, to be sure the Court would consider the wife’s legacies given and taken in lieu of dower as a purchase, and would not oblige her to abate, as in the case of Mrs. Loocock v. Clarkson, decided in this Court. But no such question arises here.
It is therefore ordered and decreed, that the lands and negroes of the estate, which did not pass under the testator’s will, shall after sale made thereof and the money collected thereon, be applied first to the payment of the debts of the testator and then to the payment of the pecuniary legacies under the testator’s will, with interest from one year after his death, and the balance shall be distributed among the next of kin, conformably to the statute of February, 1791.
The lands and negroes shall be sold by the master, to wit : The negroes one fourth cash and the balance on a credit of one and two years, taking bonds with personal security and a mortgage of the property 5 also, the land, one fifth cash and the balance in one, two, three and four years, taking bonds with personal security and mortgage of the property. The sale to commence on the fourteenth day of January next, or the first fair day thereafter,
Henry Wiiuiam Desaussuke.
On Tuesday the 8th October, 1811, the counsel for *390 the several parties attended, and requested the Court exP^a^n ai>d enlarge the decree pronounced in the a-case, by expressing its opinion more directly upon that part of the will of the late Mr. John Cogdell, which makes sundry devises and bequests to Mrs. Esther Cog-the widow of the testator.
The devises to Mi’s. Cogdell in question are set forth fully in the body of the decree abovementioned. They are of a house in Georgetown for life ; also, his pew in the church, his carriage, horses, cows and seven ne-groes by name ; also, his household and kitchen furniture ; also, the sum of 800Í. as received from the sales of his estate $ all which (the testator says) he gives his wife in bar of dower ; and if she should depart this life without any lawful issue, in that case to be divided amongst his heirs hereafter named. If otherwise he gave it to her and her lawful issue forever.
He afterwards devises the house abovementioned to his nephew, J. S. Cogdell, and requests his executors to make sale of all the residue of his estate to the best advantage for his heirs; and then he 'bequeaths to his three nephews, John, Clement and Richard Cogdell, all the residue and remainder of his estate, to be paid them as above.
It is stated by agreement of all the parties that Mrs. Cogdell has no lawful issue living, and it is added that from her advanced age, there is no probability of her leaving issue.
The parties are desirous to know the opinion of the Court, upon their respective rights, in the event of Mrs. Cogdell’s dying without issue.
Although it may perhaps be considered premature to express any opinion, before the event happens, on which the questions can arise, I have no objection at the desire of the parties, to state what I think upon the subject, to prevent, as it may do, future litigation.
Two questions would arise upon the event occurring, which is spoken of by the will, to wit, the death of Mrs. Cogdell without leaving lawful issue.
*391 1. Whether all the devises and bequests made to her by the will, would pass from her and her representatives ?
2. To whom they would pass under the expression «to be divided among the testator’s heirs hereafter named ?”
Upon the first question I have no doubt. The several bequests are all connected by the word also ; and at the close the testator says, all this I give her, &c. and if she dies without any lawful issue, I give it in that case to be divided among my heirs. If she dies leaving lawful issue, then to her and her issue forever. The plain intent of the testator is, that the quantity of interest the wife is to take in all the bequests, is to depend upon her leaving lawful issue or not. If she did leave issue, they were to take the several bequests $ if not, the property bequeathed was at the end of her life, to go to his heirs hereafter named.
Tins intent must prevail j and upon Mrs. Cogdell’s death, if she should not leave lawful issue, the property so bequeathed must go over to the testator’s heirs.
The next question is, to whom would the property comprised in the said bequests pass, upon this event happening, under the'words “to be divided among my heirs above named.”
The testator left several sisters, and the children of several deceased sisters, and of a deceased brother. According to our law, these sisters, and the children of the deceased sister and brother, are the testator’s heirs, and would all take under the generality of that term, unless restrained by other words, or plain intent.
It appears pretty plainly throughout the will of the testator that he preferred his nephews, the sons of his deceased brother, and intended to constitute them his heirs, or to bestow on them the bulk of his fortune. This alone however would not be sufficient to establish them his heirs universally, to the exclusion of others e-qualiy near to testator. The intent must be plain, as applicable to each particular property, or there must *392 be some strong, broad expressions completely establishing them to be his heirs general.
In this case I think the intent is sufficiently plain to §’l,ide our judgment. The testator requests his executors to make sale of all the residue of his estate to the advantage for his heirs. And the» immediately gives and bequeaths to his three nephews, John, Clement and Richard, all the residue and remainder of his estate.
This residuary clause which comprehends all the property then held and possessed by the testator, and not completely disposed of by his will, and the use of the word « heirs,” in reference to these three nephews do, I think, establish their rights. I am of opinion, therefore, that in event of Mrs. Cogdell’s dying without leaving any lawful issue, all the property comprised in the several bequests to Mrs. Esther Cogdell, will pass under the will to the three nephews abo ve named; except the house and lot in Georgetown, No. 91, which will pass to Mr. John S. Cogdell, under the express provisions of the will.
HeNry Wiixxam De satis sure.
October 15, 1811.
In the above case his honor the Circuit Judge having decided, amongst other things, that the slaves in bill mentioned, « who had been acquired by the testator subsequent to the making of his will, could not pass thereby, for want of a republication thereof, no evidence of such republication having : been given,” the defendants, Clement S. Cogdell and Richard W. Cogdell, do appeal from such decision, and as a ground for such their appeal do state, that there was sufficient evidence adduced at the hearing to establish such republication, whereby the said slaves could have passed, and therefore that the said decree of his honor was erroneous in this respect.
Thomas Parker, counsel for the defendants^ C. S. & R. W. CogdelL
*393 Decree affirmed for the reasons therein assigned.
(Signed,)
W. ThompsoN,
Henry W. Desaussure,
Theodore Gaiiiard,
Thomas Waties.
March 20,1812.
This case was argued by Mr. Parker for the appellants.